*Court of Common Pleas, Dauphin County, March 26th, 1864.*

THE COMMONWEALTH OF PENNSYLVANIA *v.* THE ERIE RAILWAY.

An act of Assembly imposing a tax on the tonnage passing through a State to or from other States or foreign countries, upon any railway, canal, river, or any other mode of conveyance, is in violation of the Constitution of the United States, and is void.

A statute imposing a tax required quarterly returns to be made and a tax to be paid before a particular day; there was less than three months between the time of passing the law and that fixed for the return to be made. Held, that that would not relieve from taxes during that period. The act of 25th August, 1864, does not repeal that of 30th April, 1864.

An act of Assembly authorizing a railway to be built upon the payment of a certain sum to the State, and imposing a tax upon the same ratio as upon other property of a like kind within the commonwealth, is not such a contract between the State and the company as will prevent the legislature from imposing other taxes upon it.

(Pennsylvania Railroad Company *v.* The Commonwealth, 3 Grant, 129, distinguished.)

BY THE COURT.—This case came into court on an appeal from the decision of the auditor-general and State treasurer, who, on the second day of September, 1864, settled an account against the defendant charging it with a tax on the tonnage carried over its road between the first day of May and the first day

[The Commonwealth of Pennsylvania *v.* The Erie Railway.]

of July, 1864, pursuant to the provisions of the act of April 30th, 1864. The aggregate of tonnage carried between those periods was 164,611 tons, of which 88,831 $\frac{1560}{2000}$ tons were of the second and 75,779 $\frac{1442}{2000}$ tons were of the third class, as mentioned in the statute. Of this, 2104 $\frac{1880}{2000}$ tons of the second and 13,957 $\frac{512}{2000}$ tons of the third class were received and delivered in the State of Pennsylvania; all the residue was in transit through this State for the Western or Eastern States or for foreign countries. On this tonnage an aggregate charge of $5565.60 was made by the accounting department as due for taxes. Several exceptions have been taken to the validity of the tax as assessed against the Erie Railway Company, and numerous propositions presented against the constitutionality of the laws attempting to impose it; all of which will be duly considered by the court.

The defendant is an incorporated company, created by the laws of the State of New York, having its principal place of business within the city of New York; its line of railway almost entirely constructed through that State; its capital stock held mainly by the citizens thereof or foreigners, yet running for a short distance through the counties of Pike and Susquehanna, in the State of Pennsylvania, and thus doing business, to a certain extent, within this State. It is contended on the part of the defendant:

I. That it is not embraced by nor intended to be included within the provisions of the statute imposing the tax. The act is very general and broad in its terms, including not merely all companies created by the laws of this commonwealth, but all corporations or companies *doing business* therein, without any regard to the distance the tonnage is transported, where the stock is held, who created the company, or whether the transportation be by railroad, steamboat, canal-boat, or other means of transportation, on natural or artificial navigation, provided any part of the business be transacted within this State. The injustice of applying the law to this line of transportation has been strongly urged, as it is conceded that the road, nearly five hundred miles in length, passes in all but about twenty-five miles within the boundaries of Pennsylvania. With the justice or injustice of the enactment we have no concern, provided the road belonging to the company comes clearly within its intendment. For that the legislature is alone responsible. We must carry the law into effect. This company may have the consolation of knowing that it is no worse off than its neighbors. What is called the Lake Shore Road, extending for about thirty miles across the triangle at Lake Erie, and being the connecting link on the great line of travel from East to West, is subject to a similar tax for every ton of freight transported from the great West to the cities of New York and Boston. The road from Philadelphia to Baltimore, about one hundred miles long and running perhaps fifteen miles through

[The Commonwealth of Pennsylvania *v.* The Erie Railway.]

Pennsylvania, is subject to a like charge. Some of the coal roads, not over ten miles in length, and leading to the natural navigation of the Ohio or Susquehanna rivers, pay a like duty. All are assessed by the ton, with the same tax charged against the Pennsylvania Railroad, extending by a direct line over four hundred miles through this State, and, with its different branches, forming continuous lines reaching over a thousand miles in length; or the Northern Central or Reading Railroad, each with their connecting branches stretching their lines of communication for many hundred miles within our borders. Several other like instances might be mentioned. The inequality and injustice is so glaring as to almost lead one to believe that the law had been framed on the suggestion of the great roads to measurably escape the burden of taxation and throw it on the smaller ones. Had it been imposed · on the *ton per mile*, according to the distance travelled, this objection would have been entirely obviated. We have no doubt that the Erie Railroad comes within the words and intention of the act of Assembly, and however unequal and unjust we may consider it, the law, if constitutional, must be enforced.

II. As quarterly returns are required to be made, commencing on the first day of July, 1864 and as only two months had intervened between the enactment of the law and that day, it is contended that no tax was lawfully due or need have been reported, consequently the settlement was illegal. We are of a different opinion. Although the statute speaks of quarterly returns, and directs the payment to be made of the tax on tonnage for the next three months preceding the first of July, yet that part of the act is merely *directory*, the time is not important, and the tax can lawfully be charged for the tonnage during a single month, if no more had intervened. It is evident that the bill was reported at an earlier day, but was not passed into a law until the 30th of April, leaving less than three months until the first day of July. It will not relieve the company from paying that two months' tax.

III. It is contended that the statute is virtually repealed and superseded by the act of August 25th, 1864, on the same subject-matter; therefore no tax was due on the first of July. We cannot give our assent to that position. The act of August was apparently intended to correct some errors and omissions in the former law, by fixing return days for the other three-quarters of the year, as well as the one ending on the first day of July; also, to require like payment from companies not transporting but receiving *tolls* from the carriers; also, more plainly and explicitly to impose the tax on companies outside of the State, enjoying privileges or doing business within our borders. This, we conceive, was unnecessary, as the tax was clearly imposed before, but no part of the latter is intended as a repeal of the former law,

[The Commonwealth of Pennsylvania *v.* The Erie Railway.]

both were designed to stand in full force, and there are no words of repeal, nor does it follow by any necessary implication.

IV. The defendant says that the law imposing this tax violates the contract between the State and the Erie Railroad Company, under which the road was made across the Pennsylvania line, as a certain sum was agreed to be paid for the privilege, and a tax was to be imposed equal to the cost of constructing that part of the road within this State on the same ratio, and no more than is imposed on other property of like kind in this commonwealth. If the act of March 26th, 1846, had contained an express provision that no other tax should be imposed except that mentioned, we would hold that it was a binding contract and could not be violated. For although our Supreme Court has at times declared that no legislative enactment can tie up the hands of future legislatures from imposing additional taxes on property or franchises, yet we consider the law clearly settled otherwise by the Supreme Court of the United States, in a series of decisions from Fletcher *v.* Peck (6 Cranch, 87) and the State of New Jersey *v.* Wilson (7 Cranch, 164), down to the last book of the reports of that court, and the decisions of that tribunal in cases under the Constitution of the United States are binding on every court in the nation. Such a law would impair the obligation of the contract. This statute contains no such provision, and the power of the legislature is not to be taken away by implication. The right to levy and collect taxes is a necessary incident of every government, essential to its very existence, and is never presumed to have been surrendered or abandoned except by clear words, and for what is deemed at the time an adequate consideration, to be judged of by the legislature making the contract, and relied upon and acted under by the opposite party.

This defence is unavailing.

V. It is argued that the act of 1864 is repugnant to the Constitution of the United States, which secures to Congress the power to regulate commerce with foreign nations, and among the several States, and prohibits the States, without the consent of Congress, from laying any impost or duty on imports or exports or on tonnage. If the act of Assembly violates any of these provisions, it is thus far clearly void, as the Constitution of the United States and the laws passed pursuant thereto, are the supreme law of the land. In case of any repugnancy, the inferior must give way to the superior power.

This subject, which is of the highest importance to every State in the Union, naturally divides itself into two parts: 1. The imposition of a tax on the tonnage delivered or received within this commonwealth, and 2. That belonging to other States or foreign countries, which is merely in transit through it.

It is settled by the highest judicial authority in the United

States, that the regulation of that kind of commerce which is completely internal, carried on between man and man in a State, or between different parts of the same State and which does not extend to or affect other States, does not come within the powers of Congress.    The completely internal commerce of a State may be regulated by the State itself (Gibbons *v.* Ogden, 9 Wheaton, 1). The power to regulate commerce with foreign nations has always been conceded to be exclusively vested in Congress, and the Constitution, in the same sentence, confers the power on that tribunal to regulate it among the several States, and with the Indian tribes.    Chief Justice Marshall, in the case cited, declares that it does not mean merely traffic, buying and selling, but *intercourse.*

It is shown substantially, that it embraces the carrying of goods from one State to another, either by land or water, and by virtue of that authority Congress has passed laws regulating the coasting trade.    It cannot be pretended that any State could levy a duty on imports or exports, or close its ports against the licensed vessels sailing from other States.    We think that the right of every citizen to freely pass with his articles of trade from one port of the United States to another, through the great rivers of the country, or any other navigable highway of nature, cannot be denied; and it is equally clear that he can travel over, and carry his commodities upon artificial highways from State to State, without molestation or hindrance on the part of State authorities, except so far as restraint may be found necessary for police regulations.

One great object in abolishing the Articles of Confederation and adopting the Federal Constitution, was to secure an impartial tribunal to regulate the general commerce of the country, not only with foreign nations, but between the several States.    Those situated on the seaboard might, by the imposition of heavy duties, exclude the interior States from the enjoyment of any commerce whatever, could entirely cut them off from the foreign markets. Hence the extreme jealousy of permitting any duty on imports or exports to be imposed by the laws of States, either directly or indirectly.    In the case of Brown *v.* The State of Maryland (12 Wheaton, 419), it is decided that a law of Maryland, requiring the importer of foreign merchandise to take out a license to enable him to sell, in the original package, was in violation of the Constitution of the United States, as substantially imposing a duty on imports, that it might as well be required on the delivery of the goods at the port of entry as in the hands of the importer, as the sole object of importation was sale.    And there could be no difference, in effect, between a power to prohibit the sale of the article and a power to prevent its introduction into the country ; and if a State can tax, it can prohibit; for its taxes may amount to a prohibition, and thus the great importing States be enabled to collect

a tax from the non-importing. In the course of this very able and well-considered opinion, Chief Justice Marshall says : " The action of the States cannot interfere with any regulation of commerce. If the States may tax all persons or property found on their territory, *what shall restrain them from taxing goods in transit through the State, from one point to another, for the purpose of exportation?* The laws of trade authorize this operation, and general commerce requires it. *Or what shall restrain a State from taxing any article passing through it, from one State to another, for the purpose of traffic?* Or from taxing the transportation of articles passing from the State itself to another State for commercial purposes? These cases are all within the sovereign power of taxation, but would obviously derange the measures of Congress to regulate commerce, and affect materially the purpose for which that power was given."

If the words, thus uttered by this learned judge, be a sound exposition of the law, they certainly show that any tax or duty imposed on goods passing from one State through another is in violation of the Constitution of the United States. We find the same language used by Chief Justice Taney in the license cases (5 Howard, 575–6) : " A tax upon them, while in this condition, for State purposes, whether by direct assessments, or indirectly by requiring a license to sell, would be hardly more justifiable in principle than a transit duty upon merchandise when passing through a State. A tax in any shape upon imports is a tax on the consumer by enhancing the price of the commodity. And if a State is permitted to levy it in any form, it will put it in the power of a maritime importing State to raise a revenue for the support of its own government from citizens of other States, as certainly and effectually as if the tax was laid openly and without disguise as a duty on imports. Such a power in a State would defeat one of the principal objects of forming and adopting the Constitution. It cannot be done directly as a duty on imports, for that is expressly prohibited. And as it cannot be done directly, it could hardly be a sound construction of the Constitution which would enable the State to accomplish precisely the same thing under another name and in a different form." The learned judge reiterates what was said by Chief Justice Marshall in Brown *v.* The State of Maryland, and although a majority of the court differed from Chief Justice Taney on other points, these principles were not disputed.

These cases arose in relation to the foreign commerce of the country, but we have already said that the same power precisely is reserved as to the commerce among the States. The question also arose as to the power of a State to tax the trade coming from other States. This was done by the legislature of Missouri, which required a higher amount to be paid for a license to sell the commodities manufactured in other than was exacted from those who

[The Commonwealth of Pennsylvania *v.* The Erie Railway.]

dealt exclusively in goods the product or manufacture of that State. The Supreme Court declared the law to be a violation of the Constitution of the United States, and the whole subject is most carefully examined, and an elaborate and well-reasoned opinion reported in 27 Missouri R. 464. The judge declares at p. 473: "It would be a bold proposition to say that the States of the Union have concurrent power with the United States in the regulation of commerce. One main object of the Union was to have a unity of commercial as well as of political interests, which can only result from a unity of government." There is no question of greater moment as relates to the peace and harmony of the States. If each State is permitted to regulate for itself, it would beget discontent, and lead to retaliatory measures. One main objection to the old Articles of Confederation was the want of this power. A great difficulty arose from the seaboard States taxing the commodities of the interior States, and the court declares that nothing would be more strictly a regulation of commerce than these discriminating licenses, or come more completely within the inhibition of the Federal Constitution ; and it then declared, as in McCullough *v.* The State of Maryland (4 Wheaton, 430–31), "it is a question of *power*, and if the power to tax exists, it may be so exercised as to destroy."

It is said, however, that this is not a tax on the tonnage carried, to be paid by the transporter, but by the company, and, therefore, it does not affect the commerce between the States, but the profits of the company only. The return is required to be made by every railroad, steamboat, and slack-water navigation or other transporting company doing business within this commonwealth, of the entire number of tons of freight traffic carried or moved by said company or corporation, and graduates the amount to be paid per ton upon all tonnage carried upon or over their respective lines of transportation, and fixes different rates of tax on the different kinds of commodities. It also provides that tonnage need not be paid on different connecting lines, but payment may be demanded from any company over whose line it passes. The law applies alike to all means of transportation, whether on the. navigable rivers passing through the State, the great lakes of the West, or any line of canal or railroad. If goods are started from Olean, in the State of New York, to be carried on the steamboats or other boats of a transportation company, to New Orleans, they may be taxed by the ton so soon · as the boat with its freight crosses the line of Pennsylvania, and thus our great rivers be no longer free to the commerce of all the citizens of every State through which it passes. A steamboat company incorporated in Buffalo or Chicago, by the laws of the respective States, is engaged in transporting freight from one port to the other, and is so unfortunate as to require coal or other fuel when near Erie, goes into that port, and

is taxed by the ton for all the freight on board. The same consequences would follow, should the boat stop at that place to receive or land freight; a like tax could be imposed by Ohio and Michigan, and thus the free commerce of the lakes, hitherto enjoyed by all the citizens, be broken up. If the power to tax exists, it has no limit but the legislative discretion or the wants of the State treasury. If a tax of two, three, or five cents per ton can be imposed, one of two, three, or five dollars will be equally constitutional, and thus the trade of the interior be effectually cut off from the seaboard. If Pennsylvania can tax the grain or flour of Minnesota or Nebraska, it may be done also by Wisconsin, Iowa, Illinois, Indiana, Ohio, and New Jersey, before it reaches the city of New York, and thus its whole value to the producer be absorbed in taxes. It matters little by what name you call this tax, whether upon the tonnage passing through the State, or upon the means of its transportation, if in reality it operates on the commerce among the respective States, and tends to incumber or embarrass it, the act is unconstitutional. The law looks beyond mere words to things, to substantial effects. Such has been the repeated declaration of the court in construing the Constitution of the United States. This is sufficiently exemplified in several of the cases already cited, to which we may add Almy *v.* California (24 Howard, 169). The State of California had, by law, imposed a tax on each bill of lading for gold or silver transported from the State to any port or place out of the State, and it was held to be a tax on *exports.* Chief Justice Taney, in delivering the opinion, says that every one can see that if the tax was imposed on the article exported, it would be a duty, and the bill of lading, though differing in form, is substantially the same thing, as it is necessary evidence of the export of the commodity. So here the tax in form is required to be paid by the transporting company, but necessarily falls upon the goods transported, thereby increasing the cost of the article to the consumer, or diminishing its value to the producer (see also 12 Howard, 293).

In Corfield *v.* Coryell (4 Wash. C. C. R. 378), Judge Washington says : "Commerce with foreign nations and among the several States, can mean nothing more than intercourse with those nations and among those States for the purposes of trade, be the object of the trade what it may; and this intercourse must include all the means by which it can be carried on, whether by the free navigation of the waters of the several States, or by a passage over land through the States, when such passage becomes necessary to the commercial intercourse between the States. It is this intercourse which Congress is invested with the power of regulating, and with which no State has a right to interfere." In Sturges *v.* Crowninshield (4 Wheaton, 122) it is said : "When the nature of a power requires that it shall be exercised by Congress, it is completely

[The Commonwealth of Pennsylvania *v.* The Erie Railway.]

excluded from State legislation;" and in Gibbons *v.* Ogden (9 Wheaton, 1), already cited, it is said: "The power over commerce with foreign nations and among the several States is vested in Congress as absolutely as it could be in a single government having in its constitution the same restrictions on the exercise of the power as is found in the Constitution of the United States. There is no restriction in the Constitution; the power is clearly conferred and must consequently be sole, entire, and conclusive beyond State control or regulation." In the passenger cases (7 Howard, 283), where it appeared that the States of New York and Massachusetts had imposed a tax on each alien passenger arriving in the ports of those States, it was held that the law was unconstitutional. The case received great consideration, and in the course of Judge Catron's opinion, at page 445, he gives the history of this provision of the Constitution, and says: "That if the States can tax the persons or commodities passing from one State to another, we might as well be under the old Articles of Confederation, and the provision prohibiting the States from laying any duty on imports and exports, and the one which declares that vessels bound to or from one State shall not be obliged to enter, clear, or pay duties in another, were especially intended to prevent the evil. Around our extensive seaboard, on our great lakes, and through our great rivers, this protection is relied on against State assumption and State interference. Throughout the Union our vessels, of every description, go free and unrestrained, regardless of State authority. They enter at pleasure, depart at pleasure, and pay no duties." He then goes on to show the great distance which steamboats pass over on lakes and rivers, and declares that the tax cannot be imposed either on the persons or property passing. In another part of the opinion, at p. 448, he said: "If this court could sanction the doctrine, the time is not distant when States holding the great inlets of commerce might raise all necessary revenues from foreign intercourse and from intercourse among the States, and thereby exempt their own inhabitants from taxation altogether."

Mr. Justice Grier, in his opinion, at page 458, says: "The true character of the law cannot be changed by its collocation; a State cannot do that indirectly which she is forbidden by the Constitution to do directly. If she cannot levy a duty or tax graduated on the tonnage or admeasurement of the vessel, she cannot effect the same purpose by merely changing the ratio and graduating it by the number of masts, or of mariners, or the size and power of the engines, or the number of passengers she carries. We have to deal with *things* and we cannot change them by changing their *names.*" In another part, he shows that a condition cannot be annexed to the right of persons to pass through the State, and the right *to tax* is predicated on the right to *exclude* them, which does not exist, and shows clearly that the *right to tax is the*

*right to exclude.* Again, he shows that there is no power to tax persons or property passing through the State. We have, therefore, come to the conclusion beyond all doubt, that there is no authority in our legislature to tax the commerce of other States passing through this State. The power existed to exclude the Erie Railroad or any other road from passing through the State, but having been granted for a consideration, it cannot be revoked, nor can a tax be imposed on the trade or commerce of other States passing over it. They must have the free right of transit untaxed and unmolested. It is said that this is merely a tax on the corporation, not on the goods; but it is well established that in construing the power under the Constitution we look to things and effects, not to expressions or collocation of words, and the tax must eventually fall, in these cases, on the producer and consumer and not on the transporter. But it may well be asked, what authority has the State of Pennsylvania to impose a tax on this corporation? It was not created by our laws, has not its place of business within our borders, and the capital of the corporation is not held by our citizens. Such an attempt would be very similar to that of the State of California to tax the steamship company, which was decided by the Supreme Court of the United States, in Hays *v.* The Pacific Mail Steamship Company (17 Howard, 596), to be unconstitutional. The vessels were owned by a corporation created under the laws of New York, its capital held there, and the ships registered in that port. The attempt was to tax them at San Francisco, where business detained them longer than at any other port; and Mr. Justice Nelson, in delivering the opinion of the court, says the State of California cannot impose this tax. If it could, they might be taxed in every other State where they touch in the course of business, and the proper place of taxation is where the corporation exists and the vessels are owned and registered.

The present case is not an attempt to tax the works of the company in this State, nor the capital invested in their construction, but the business and trade passing over the road, which is, in effect, to exclude the commerce of other States from crossing our boundaries. This has been truly said to be a question of *power*, for if the State can tax it can *exclude*. The State of New Jersey attempted to tax the business of this same railroad company, and the question as to the legality of that tax was raised and most carefully considered in the Court of Errors and Appeals in the case of The Erie Railroad Company *v.* The State of New Jersey, reported in the Law Register of February, 1865, page 238, and a unanimous opinion pronounced against the constitutionality of the law. The reasoning of Chief Justice Beasley is cogent and powerful and the investigation of the subject full and exhausting; it entirely covers the point raised in the present case. It is said,

[The Commonwealth of Pennsylvania v. The Erie Railway.]

however, by the counsel for the commonwealth, that this principle is settled in Pennsylvania by the decision in The Pennsylvania Railroad Company v. The Commonwealth (3 Grant's Cases, 129). We do not consider that decision raised the point now presented. The case turned on a contract to pay a certain tax on the business of the road as part of the terms on which the corporation obtained the charter, and it was wholly unimportant whether it was to pay by the ton, the car-load, or the bushel; the amount to be paid in proportion to the business done was a commutation for a gross sum or price annually, for leave to construct the road through the State; this, in part, because it interfered and competed with the transportation on the public works. We decided that case mainly on the ground of contract, and no tax was imposed by the road on the commerce of the country; the railroad company itself paid the tax. The money was there paid on a contract between the parties; this arises from a tax law directed to them. Even if the point had been directly decided by the Supreme Court of Pennsylvania, which it certainly has not, we would not consider ourselves bound by the decision if it came in conflict with those made by the Supreme Court of the United States, as that is the tribunal which must ultimately settle every question arising under the Federal Constitution. We would yield implicit obedience to every decision of our own Supreme Court in questions arising under the laws and Constitution of the State, but when presented under those of the United States, they are entitled to the same weight and no more than those made by the courts of New York, Massachusetts, or New Jersey, and not binding as authority and only entitled to deference and respect so far as they conform to the supreme law of the land,—the Constitution of the United States as construed by the Federal judiciary. The jury is therefore instructed: *First.* That the act of Assembly, so far as it imposes the tax on the tonnage passing through the State of Pennsylvania to or from other States, on the Erie Railway Company's road, is in violation of the Constitution of the United States, has no binding effect, and is void. *Second.* For the determination of the present case we are not called on to decide whether the tax can or cannot be imposed on tonnage taken from Pennsylvania to the markets of other States or from other States into Pennsylvania, as the question does not arise. The tax is imposed by the department on the return made, which must be most strongly construed against the company making it. The return does not show whether the $13{,}957\frac{512}{2000}$ tons was both received and delivered in this State, or received in Pennsylvania and delivered elsewhere, nor has it been proved on the trial. The same may be said of the $2104\frac{880}{2000}$ tons of the second class. We must, therefore, presume that it was entirely an *intra-territorial trade*, and from what was said in the outset, being such, it is under the con-

[Commonwealth of Pennsylvania *v.* Delaware, Lackawanna and Western R. R.]

trol of the State legislation and can be taxed. There was, therefore, due to the commonwealth at the time of settlement on the tonnage that we presume from the return to have been received and delivered within the State, the sum of $761, on which, under the act of Assembly, interest must be charged after three months from the day of settlement at the department. You will, therefore, render a verdict in favor of the plaintiff for $806.18. This substantially answers all of the points raised on the trial except the sixth, relative to the duty on tonnage. We do not consider the law of Pennsylvania as coming within that prohibition, which was clearly directed against the power of States to tax vessels coming within their harbors in proportion to the tonnage—a well-known and understood method of taxation under the Articles of Confederation. The statute is only subversive of the third number of the eighth section of the first article, which relates to "the commerce within the States," and would be equally objectionable if the tax was imposed upon each bushel, barrel, or car-load of produce or foot of lumber.

*Meredith*, for plaintiff.

*Campbell and Kunkel*, for defendant.

NOTE.—Writs of error were taken in this case and that of the subsequent one, The Commonwealth *v.* The Delaware, Lackawanna and Western Railway; but W. M. Meredith, then attorney-general, declined to argue them, considering that the decisions were right. The same principle afterwards arose in The Commonwealth *v.* The Philadelphia and Reading Railroad, was decided in the same way by the court of Dauphin county (1 Pearson, 379), and affirmed by the Supreme Court of the United States (15 Wall. 232), reversing the Supreme Court of Pennsylvania.